Each side has 30 minutes to the side, and I assume someone is reserved for rebuttal for five minutes. So we'll get on with the business of the day by calling Mr. Richard H. Burr III, who we'll hear from you. Judge Jolly, Judge Owen, and Judge Haynes, may it please the Court. I'd like to discuss three issues with you today. I know you all have read the brief, so I'll refer to them in short order. The first is the Atkins issue. The second is the Batson issue. And the third is the procedural default of three sets of issues, trial ineffectiveness, Brady, and competence to stand trial. I'd like to proceed in that order, starting with the Atkins issue. Short background on the Atkins issue, just to set the context for where I think we are with the Court today. In late 2006, early 2007, there was a seven-day evidentiary hearing held before the state habeas trial court on the Atkins claim. At the end of that claim, obviously, the Court found that Mr. Butler did not have what we now know as intellectual disability or mental retardation on both the intellectual functioning prong and the adaptive functioning prong. And since she found neither of those, she found that the disability did not develop during before he was 18 years old. We brought that, of course, into federal district court. The only state expert in the evidentiary hearing was a doctor named George Dinkowski. He was a psychologist. Before the federal district court, we argued quite strongly that Dr. Dinkowski misled the state court into making objectively unreasonable findings. Don't we need to get right down to it, maybe, and that is your strongest case would appear to me, at least, to be, I mean your weakest case, I should say, would be to overcome the adaptive aspect of the analysis. No question about that. And so how do you address that? Let me get straight to it. When we came back before Judge Lake in the Rule 60 proceeding, after all the proceedings against Dr. Dinkowski, and he had been pretty thoroughly discredited by the state court because of the censure by the Board of Psychologists, Judge Lake found, on the one hand, that he really could not stand at all with Dr. Dinkowski on intellectual property, but he purported to separate Dinkowski's influence from the adaptive behavior evidence and found independent of that, he articulated independent of that, that we had failed to show significant impairments in adaptive behavior. We think that conclusion is wrong and objectively unreasonable from the perspective of 2254D and the state courts for three reasons. The first is Dr. Dinkowski testified that he found that Mr. Butler's IQ was an 80. That was a thing that Judge Lake had pretty thoroughly discounted. But he testified that the IQ was 80 and that Mr. Butler functioned in the world as a person with an IQ of 80, therefore not as a person with mental retardation. That sort of framework set the whole perspective for viewing Mr. Butler's behavior in the world. He said that he functions in the community like a person with an IQ of 80, not like a person with mental retardation. He then focused on all the things Mr. Butler could do, and of course people with intellectual disability can do a lot of things, but they cannot do a lot of things as well, and it's  But with that perspective, Dr. Dinkowski sort of framed the whole issue as, this is a normal guy out there doing normal things. And so the state court and Judge Lake focused on the things he could do that were normal. And both we submit thoroughly neglected to take into account and weigh against the things he could do, the things he could not do. So that was, to appreciate how powerful that was, if you imagine Mr. Butler as a person functioning in the world with an IQ of 69 or 72. 69 is the IQ that he got when Dr. Dinkowski tested him on a WACE 3. 72 is what our expert found on the same test, a WACE 3. I mean, wasn't it just really a matter of credibility choices until you throw Dombrovsky into it? And if you're going to win on that point, don't you have to rely heavily on the influence that his testimony had on the adaptive analysis? No question, but that's what I believe happened. This link between the IQ of 80 and his saying very strongly and very clearly to the court, he functioned in the world like a person with an IQ of 80. So it kind of all got glommed together is what you're saying in the mind of the judge originally. That's right. And what he did was create a picture of a person without intellectual disability functioning in the world. And so that's how you... So then that's the prism that it was viewed. That's precisely it. All right, but I'm wondering how we, in this question of whether it was an unreasonable determination of the facts, how do we view the sort of short shrift procedure that occurred after the Texas Court of Criminal Appeals chose to send it back for a subsequent proceeding and then apparently the state court just really did nothing new other than to accept some updated findings? Right. And in fact, the updated findings were primarily to take out the word credible. Credible. I know that. But what I'm trying to say is, does the lack of any additional process other than simply signing off on the state's slightly revised findings of fact, does that weigh into the calculus of whether the determination of the facts was unreasonable? It does. It does to at least, in at least one extent, Judge Haynes. One of the other critical ways that Dr. Dinkowski influenced the adaptive behavior finding in the state court was to say that he didn't believe any of the lay witnesses who talked about Mr. Butler's adaptive behavior, except for his parents. And his parents had testified in the penalty phase of his original trial in 1988. And at that point, the lawyer hadn't investigated mental health, didn't know anything about mental retardation, and the parents talked about Stephen as a normal boy. We proffered evidence in the remand from the CCA to show why those parents would have done that, and asked the court to hold an evidentiary hearing to consider that. Because that really was becoming a very pivotal issue, is why did the parents do this? How much weight should you give to what they said in the penalty phase testimony? The court didn't even rule on our motion to allow these affidavits we presented to be considered or to hold a hearing. So to that extent, I think there was a critical lack of process, because had we been able to have a full-blown consideration of that evidence, I think that we would have persuaded the state trial judge and probably the CCA that there really was something rotten at the core of this, that if you're just going to believe the parents and disregard all the other lay witnesses, then let's look more closely at what the parents said, when they said it, and what circumstances impacted on that. Well, I guess what I'm wondering is, so the court originally had a great deal of process, a seven-day trial on Atkinson. We cannot criticize the state district judge in the original proceeding. Then it comes back, and we have this do-over, but it's a do-over to encapsulate the fact of Dinkowski's problems. And so the state judge, it seems to me, said to herself, I'm just going to exclude Dinkowski from my head, and with that, and there's that one sentence about even without Dr. Dinkowski, and with that, I don't come to a different conclusion, therefore I don't need more hearings. What would suggest in the case law, what Supreme Court case or even Fifth Circuit case would suggest there's anything wrong with the state court saying, I heard the seven days, I remember the seven days, I got the transcript of the seven days, I don't need more seven days, and even without Dinkowski, we have all kinds of evidence that he could drive a car, hold a job, graduate from, get a GED, do this and that, be in the National Guard or whatever he was in, et cetera? All right. I don't think there's a case particularly on point, but what there is is the realization that taking out an expert that framed the way that you view all the evidence changes all the evidence. Well, let's assume that the state court says that she did that, and we give that at face value. Is there any case that says in these situations that the state must have expert evidence affirmatively saying he's not mentally incapacitated? In other words, if you take Dinkowski out . . . Yeah. . They said they are exercising our discretionary jurisdiction to take another look and we are sending it back to the state court for another look, state trial court, and then they issued a ruling on the merits of the Denkowski argument, albeit a short one, with a long concurrence. And so actually, is it even successive? Is it even, although second in time, is it even arguably successive because it's addressing a proceeding that couldn't have been raised in 2008 because it hadn't happened? Right. I mean, like you said, I argued at length to the district court that the way the claim was being presented, that it came up as a successive writ. It was essentially new evidence to support the constitutional claim. At the end, I guess, in hindsight, looking back, we thought that perhaps the court having a chance to reevaluate the credibility of the expert in light of the new evidence bordered on a claim of maybe fraud on the court. I know that had been raised by Mr. Butler and it doesn't technically meet that, but we thought that perhaps the best method would be to get all information about Dr. Denkowski in front of the district court and have it merged to come back up here. So I didn't push the jurisdictional issue. It's actually one of the issues the court would still have to decide. Without any briefing, basically. I guess technically there's three jurisdictional issues in front of the court now. So what's the other one? We need to grant a COA if we're going to reach the 60B. The potentiality of the successive issue, which hasn't really been briefed to us, but was briefed to the district court, although not addressing the point that I think is most germane. And what's the third one? Well, the entire Atkins claim, the question is whether the district court actually granted a COA on the whole claim. The district court's order said that it had decided that with the exception of the issue of whether Butler has sub-average general intellectual functioning before age 18, which is an element of the Atkins claim, everything else should be denied. It's foreclosed by clear binding precedent. So there's hints in the district court's opinion that it only thought the IQ prong was really debatable. However, at the conclusion and order, it does say COA shall issue as to the first claim for relief. Which is Atkins. Which was Atkins. And, I mean, it would make no sense to grant it as to only intellectual disability since adaptive is deadly anyway. Exactly. And so the parties have treated it as though it was a grant of the whole claim, but it's not really clear from the court's order.  This is a little late to be saying that. And I know that we're in agreement. We would certainly agree that the court should grant COA on this issue. Okay. As it's done with, like with Madam Morris, where it said it certainly consistent with the prior cases involving Dinkowski's methodology to grant COA. So that you can consider, fully consider the factual legal basis for the claims. So you think we should grant it on the 60B as well? Assuming it's not successive. I do. Okay. I'm changing the position that I had originally raised in my brief. I think this way the court can put the Atkins claim and the 60B together. They'll be looking at it under the same standard of review. Assuming that, you know, relief has been denied. And it would bring it all neatly in front of the court. Okay. Unfortunately, there is the other jurisdictional issue about whether the 60B was ever actually a real 60B or a successive writ. And what's your answer to the point about that when something is second in time, but it addresses a new ruling of the state court, it is not considered second or successive within the meaning of AEDPA? I believe it's not second or successive. In this instance, the court, when the court looked at the Dinkowski information, it took its original judgment and just decided to reconsider it. They did issue a new opinion, but it was a reconsideration of the same existing writ. And so they reconsidered it in light of what they knew about the Dinkowski settlement agreement and just, you know, issued a new ruling. But that new ruling, how can it be successive to challenge a new ruling that was not in existence at the time of the original habeas? That's what I'm saying. We have case law on this that says if it's a new ruling, of course you couldn't have brought it in 2008 if it didn't exist until 2012 or whatever. Right. I'd say that it's part of the 2012 ruling from the CCA is part and parcel of the original Atkins claim that's come up. But it's a new part. A new part. Okay. A new part with Dinkowski. And so if the court finds that there was . . . quite literally though, even if the court decides that it is successive and that the district court never should have considered it, it really has no . . . it's of no moment for this court because this court's consideration focuses on what the state court did. And whether this case went back on a 60B motion for the district court to look at it is really beside the point. The court's focus is on the state court adjudication. We would have to consider the 2012 anyways, what you're saying. Exactly. Okay. And in Madam Morris, the court . . . no, not Madam Morris. Maldonado, the court decided they were not going to grant a remand. Oh, no. Madam Morris. They were not going to allow a remand because they said there's no point. What's important is the state court adjudication and not what the district court might do in light of Dinkowski. So even if it's successive and the court doesn't reach it at all, that's fine. It doesn't really change the picture. The picture is, is the state court adjudication reasonable? Let me ask you about the Dinkowski sequelae. There were other defendants and now petitioners who were the subject of Dr. Dinkowski's conduct who got some sort of reconsideration from your office, as I understand it. There was some sort of public statement or something about redoing things. And is that not the case because you're . . . Not from our office. Well, someone redid some of the reviews of the other . . . The Harris County Courts, I think, the district attorney's office announced that they were going to retry some of the cases. Okay. And why was Mr. Butler not given that same consideration? I am not aware of the decision. I knew they made that decision not to decide to retry it, but I'm not aware of the reasons behind it. Okay. As an officer of the court, as a lawyer, as a person who's in the role of a prosecutor in here and therefore has a duty to justice and not just to winning, can you really sponsor this procedure that occurred after the Dinkowski problems came to light, the lack of any hearing, the lack of any really new consideration at all, just kind of whiting out the word credible and signing off on the findings of fact again? Can you really sponsor that to us? I can. As odd as it may seem, really at first blush, looking at that and having the court say, well, we only took out the word credible. It's essentially some of the same findings. That gave me pause when I first saw the findings, I'll admit. But the fact remains that Dr. Dinkowski does not influence the adaptive deficit prong. The influence is just not there. If Dr. Dinkowski is involved in the first prong and the court has concerns about his methodology and methods of procedure, it only influences really the first Atkins prong. I thought even Judge Sims relied on Dinkowski on the adaptive prong. There were only two indications . . . Fine. Judge Light. Well, in the findings themselves, Dr. Dinkowski is only mentioned twice in the state court findings. They said that he had an interview with Butler and then the other mention is that he gave the adaptive behavior scale. The interview, Mr. Butler actually relied on excerpts of it to try to make his point that he doesn't communicate well. And the second thing about the adaptive behavior scale is the state court turned it down. They said, we don't buy that. It's not a good test. We're not going to use it. So those are the only two mentions in state court of Dr. Dinkowski dealing at all with the adaptive deficit prong. So when they came back and looked at the influence of the settlement agreement and what possible ramifications that has, it just doesn't change the picture as far as that second prong. And if he doesn't make the second prong, then he's not going to make the third prong with onset before 18. Those two, at least in this instance, would merge. So regardless of whatever credibility issues or how impugned his character is now after the settlement agreement, it doesn't change that second prong. Mr. Burr is kind of making a skunk in the jury box argument in essence, except it's a judge box, I guess, that Dr. Dinkowski was so overpowering in the whole thing and that his prism was so much that Mr. Butler's fine and everything's fine and that that prism then affected the whole process to the point where you really need a new procedure, you need another hearing and so forth to rid, to wash out the taint of Dr. Dinkowski's testimony. What's your response to that? I'd say, based on the facts that were issued, that it's not this pervasive response that the court embraces. The state court did not need to rely on Dr. Dinkowski when it decided to look at evidence of the extensive criminal history from Butler or the conflicting evidence that was presented from all the lay witnesses about what he could do or couldn't do. They didn't need to. I know it's painted as a picture of he has an 80 IQ, therefore he functions in the world as someone with an 80, and the court embraced it and ran with it. I mean, the fact is, he did have an 80 IQ on the whisk, and the case, when he was 11 years old, that was in 1974. But I thought that every expert, other than Dinkowski, said you have to give effect to the Flynn effect. Now, what do we do with that in the state court record? If we go back and look at the state court record, we disregard everything Dinkowski says, then what does the record say about that whisk score of 80 and the Flynn effect? Well, the state court just rejected the Flynn effect. They said, we're not going to apply it. And actually, Dr. Dinkowski . . . Based on what? That's the thing. Dr. Dinkowski had actually come up with a different number to reduce some of the scores. I'm saying, we reject, we just carve everything Dinkowski said out of the state court record. What support in the record is there for the state court to say, we are reasonably adopting the 80 whisk score, and we're not going to lower it because of the Flynn effect? What does the evidence say? Well, the only testimony the court had in front of it was conflicting testimony about the Flynn effect. And the court just decided . . . Who countered Butler's experts other than Dinkowski on the Flynn effect? No one. So if we take Dinkowski out of it altogether, what's left? Well, the state court is not required to follow the expert testimony or to use the Flynn effect. Atkins never said that the courts have to follow clinical definitions. They never said they have to follow a certain procedure. But they have to base their rulings on evidence, and if all the evidence is consistent one way, the judge has to have a reason to reject all that evidence. That's what I think the question is getting to. Well, the evidence, even in Brasenia, the court said that . . . I mean, we will consider the testimony of experts, but I mean, the ultimate finder of fact is the court, and the court decides what it wants to do, and it may be influenced by an expert's opinion. It might follow what an expert says. Yeah, but if every doctor came in and said, Mr. X died of a clogged artery, can I just say, well, I don't really believe arteries get clogged, so I'm just not going to find that. I mean, that just doesn't make any sense to me. I suppose you could say that. You'd probably get reversed. Right, exactly, because I'm basing it on nothing. I'm basing it on my own mind. I have no evidence whatsoever to support that. I would not concede that that's nothing. Well, thank you, Judge. I appreciate that. But it's nothing when it comes to clogged arteries, we'll put it that way. And it's certainly nothing when it comes to whether there is or isn't a Flynn effect in a test that I, as a judge, have no expertise in. Well, the state court finding on the Flynn effect said that courts had not affirmatively followed it yet. They cited Maldonado from this court. They cited Salazar. They also cited – there were three cases that they cited, and just that it hasn't been adopted as some standard that we're supposed to apply. If anything, the Court of Criminal Appeals issued an opinion. Judge Cochran gave an opinion in November, just last year, in Ex Parte Cafe, C-A-T-H-E-Y, where they discussed at length the Flynn effect. It is a very scholarly opinion. And the ultimate conclusion is that the court says, we don't want anyone to reduce scores for the Flynn effect. You can consider Flynn as a factor, just as you can consider whether the judge made enough effort when he was doing testing or what the standard error of measurement is. These are all factors that you'd consider to decide the balance. But there still has to be evidence. I mean, in other words, if all the experts come in, if we're discounting Dunkowski and all the other expertise in the record discounts the 80, let's say, for whatever reason, Flynn or otherwise, then how can we rely on the 80? You can rely on the 80. The 80 is the only pre-18 IQ score. And it doesn't have to be discounted for Flynn when the courts have not held that you have to actually include a Flynn analysis or reduce scores. They were just following, at the time, they were following controlling precedent and deciding they were not going to apply this. Even though the experts said, Flynn, let's Flynn these scores down. In fact, the experts disagreed, even the defense experts disagreed, on the ultimate numbers that were going to be thrown into the mix, showing just, again, how confusing the whole theory can be. So the court had a valid 80 score. If it decided it was going to discount it, here it chose not to. It said, we don't follow this. We're following, it has not been accepted. That decision to not follow the experts does not violate any kind of established federal law. Did one of Butler's own experts say he could have had an IQ as high as 75 with the Flynn effect? It depends on the . . . Dr. Keyes? I think in my original briefing, I put charts of, here's the original score, here's what Dr. Keyes says would happen with the Flynn effect, here's Dr. Fletcher's numbers, here's an additional Flynn turning around. I don't remember anyone exactly saying 75. I know the 75 came up if you had applied standard error of measurement of plus or minus 5 on the 80. All right. What was the highest end of the range that Butler's own experts testified to? With a five-point standard error of measurement on the 80, it would put it between 75 and 85. I think even Dr. Dinkowski was saying that he just believed it was an 80, and he wasn't necessarily going any higher. What did Butler's, in the end, when they got through with everything, what were the high ranges of Butler's experts' testimony, what they thought it actually was? 72.2, I think, was from Dr. Keyes, and 72 from Dr. Fletcher. And then the recent, the Waste 3 that was given, there was one given in 2003 when Butler was 41 years old, and another one given in 2006 when he's 44 years old. Those scores were around 69 to 72, and I think Dr. Keyes had even suggested lowering one score down. I know the original WISC score, it was Dr. Fletcher who suggested it, lowering it all the way down to 65.5, almost a 15-point reduction, the way that he had, for lack of a better, the way he had manipulated the Flynn numbers. So there just was a widespread disagreement about actual IQ numbers. So IQ numbers, though, aside, the court can just bypass the whole IQ question and just focus on adaptive deficits. I mean, that would certainly be the most direct way to handle the Atkins issue. Let me ask you about the Martinez issue on whether we should grant a COA. Mr. Burr essentially is arguing that we should GVR, in essence, the Martinez issues, grant the COA, vacate the ruling of the district court, and send it back for consideration in the first instance by the district court of the Martinez argument and all of its sequelae. What is your response to that thought? The court, at first review, should be able to decide if it looks like there is, I guess, a colorful enough claim that it would pass a muster under Martinez. If it looks from the outset, though, like you said, that it was facially invalid, there would be no reason to ever consider sending it back. If the court decides that there is a chance that it's, there could be a substantial claim, and I would encourage the court to go ahead and make a ruling. What's your best argument on ineffective assistance of trial counsel to present mitigation evidence regarding his mentally impaired or mentally low functioning level, even if he's not mentally disabled or intellectually disabled? At the time of trial, counsel obtained expert assistance. It was really geared towards questions of competency, and they had two evaluations from a psychologist before trial, both of which came back and said he's confident. At trial, was there evidence about the crazy thoughts counsel was trying to kill him? All the evidence that counsel now says that the mental experts hired by the trial court should have been given, what do we do with all of that? Isn't that some evidence that trial counsel didn't effectively investigate? Well, they pursued it through expert assistance. The experts not only were they looking for competency, but the other expert, one of the two experts, came back with an opinion that there may be mental illness. Mental illness, of course, isn't the same as competency. So counsel had that information. I don't think it would be... But Butler says that everything he told those two experts that Butler had fabricated and that his trial counsel didn't go back behind that and give the mental health experts the real facts. Isn't that a colorable Martinez claim? I realize that that's definitely the allegation. I have not had a chance really to, I mean, I haven't briefed it ever fully. We didn't do merits briefing in the district court. And at first blush, you know, I have to admit the ineffective assistance of trial counsel claims looks like there will be issues that the court may decide, you know, whether it merits review under Martinez. So if we granted a COA on that, y'all would then brief that fully on the merits? Or if it needs more factual development and it hasn't gone through the district court, it may end up ultimately having to go back for determination from the district court. So if we think there is any colorable argument here on the Martinez, then you would agree with the procedure that the district court might be the better place to develop that argument more fully before we would actually consider it on the merits? As much as I hate to say yes, let's go through another round of briefing, I would agree. No, I mean, you have an obligation as officer of the court to be honest with us, and I appreciate that. I do. So don't feel bad if you have to agree to something that doesn't support the original position you'd like to take because that's what you're obligated to do. Right. Well, I feel like I've changed the approach on the COA for 60B. I mean, on last review, I've looked at all this. I honestly, I have not found a decision from this court where it has looked at an ineffective assistance of trial counsel claim that has had no merits discussion whatsoever by the district court and that this court has been the first court to decide to make a ruling on it. There are even some cases where this court has remanded claims when the ineffective assistance claim was discussed in the alternative on the merits. But I have not found one. You could be the first panel that decides to undertake it yourself, but I found no authority from this court to go ahead and rule on Martinez at the first instance. How soon were the Martinez-Trevino claims raised after Martinez and Trevino were issued? All along, Butler has argued ineffective habeas counsel, and it changed after Martinez came in because now he had new law. He'd argued the state corrective process was ineffective because habeas counsel abdicated his responsibility. So he's had that theme the whole time. I couldn't say exactly the date that he first raised it under Martinez. I know that that wasn't ever in front of the district court because the district court's ruling was in 2008. So Martinez and Trevino were 2012 to 2013. And that would be successive if he tried to go back to the district court on it. It's original to us because it's just new law that's part of our decision-making of the appeal. So, I mean, all along, that theme and argument has been raised by Butler, but it hasn't been. Except the one all along was not at the right time in the first habeas. That's the time that all this ineffectiveness of Joe Cannon and company should have been raised. Yes. The same with the Brady claim. Now, as far as the Martinez issues, of course, it would only apply to the ineffective assistance of trial counsel claims, not the Brady claim, and not the company's. Well, Brady's kind of got its own kind of vibe, if you will, on what can be raised later and not and whatever because it has to do intrinsically with a prosecutor hiding evidence. And the problem with that is that isn't always immediately apparent in the first go around. So is it your contention, though, that there can never be an excuse for the procedural default, the excuse being the continued hiding of the information? No. I would never say that's a given. In this case, though, the district court decided that the Brady issue, all the information that had supposedly not been turned over, Butler's counsel obtained it through an open records request, and so the court thought that it was important that he didn't show that he had made the request earlier or made any effort to get it and had been denied. It was something apparently that was available to him through an open records request. That's a hard one for me to swallow, particularly where the district attorney says, if we have an open records policy, why aren't defendants allowed to take that at face value and say, well, notwithstanding what the district attorney says, you have to file a Freedom of Information Act request or you lose your argument. That seems pretty hard. I think, and I may correct me if I'm wrong, there was no open file policy at the time of trial or there was? Limited. Oh, limited. Okay. So it was limited. I'm not trying to give a blanketed excuse for anyone not turning over information that they should. Okay. Can you make an argument that the Brady material was immaterial? Well, most of the information goes to one of the extraneous offenses that was introduced at punishment. It's the case of the woman, the clerk that was shot at the Amoco Mini Mart in Jennings, Louisiana. That was one of, in total, besides the capital crime, Butler had committed nine other aggravated robberies, two sexual assaults. He had confessed to shooting and killing another clerk at a convenience store in Orange, Texas. And then there was this one where there was the shooting. And what's happened with that other, with the Johnson, where the victim was named Johnson, I think? What happened to that case? I don't know. He made a statement, but I don't know that he's ever been prosecuted on it. He said he had ordered the clerk to give him the money, and the clerk refused and just shot him. Froze and put his hands there and you don't care. But I just wonder, so he's not under a sentence on that crime currently? No. The only one is the capital crime right now that I'm aware of. Where is this showing of prejudice in terms of the claims? Well, as far as the Brady claims, if that evidence had been available, it would have, and maybe, and assuming everything is correct on the Brady claim, that if they had had this information, this case would not have been introduced. It would have taken out one aggravated robbery and a shooting out of a string of many that Butler did. And so he couldn't say really that he's prejudiced by the overwhelming amount of aggravating evidence. How many alleged Brady claims are there? There's one Brady claim, but I think it dealt with statements by two officers and by the woman who was shot, and that's all dealing with the offense in Jennings. There may be another one of the crimes that they said had some questions about whether, oh, I remember, one of the clerks said they had been hypnotized. So there's a question about whether a hypnotic refreshment of testimony should be brought out. Gwen Blackwell, Madonna, Benoit, and Winnie Silcox, plus the two officers. Right. So I think we've got the hypnotic-induced testimony and then the group with the shooting. Overall, I mean, if that evidence came out and that one aggravated assault and shooting was eliminated, it wouldn't have changed the punishment evidence. The punishment evidence was overwhelming. And the punishment evidence, not only is it overwhelming, but, I mean, the details of those crimes were really important when deciding about Butler's adaptive functioning. In the crimes, in one instance he's putting his flashers on his car, raising the hood, and pretending he's got car trouble so that people will leave the store so he's got an empty store when he goes in to do a robbery. And he does – there's a lot of planning and a lot of skill that's involved in him doing this. When you're looking at someone who is, you know, MR, you're looking at the bottom 1% to 2% of the people in the world, and he just doesn't fit that, not with what they have in front of them as far as adaptive behavior, not with the IQ score that they still have. I would encourage the court to affirm the district court's denial of habeas relief, affirm the ruling on 60B as no abuse of discretion, and deny COA as much as possible. Okay, Ms. Hayes, thank you very much. Mr. Burr, we'll hear from you. It says five minutes. I'm not sure. Oh, now it's counting down. I won't take five minutes unless you ask me a lot of questions. Do you want to say anything about the successive issue? Oh, yeah, yeah, the point that Your Honor raised. I wish I had thought of that. I think you're absolutely right. I mean, the Supreme Court – Well, the lucky thing for you is subject matter jurisdiction is something we have to consider and whether you make the argument or not. No, I understand that, but I'm embarrassed that I didn't make the argument because it's quite clear that second in time doesn't mean successor, and this not only was a new decision, it was new evidence because of the board. And not newly discovered, new evidence. Brand new because of the board of psychology. Yes, new chronologically. Didn't exist, not extant. I think that eliminates any question about the 60B being a successor. One point about adaptive behavior, and that is not only were there two judges concurring in the CCA, there were two judges dissenting. Well, there were three that concurred and two dissented. Okay. I thought it was Cochran and Alcala, but anyway. And Herbie were concurring. So three to two. I lost. But I lost anyway. Yeah, because you had four who didn't say anything. Right. But the dissent by Judge Price, joined by Judge Johnson, I think very deftly analyzes the pervasive influence of Dr. Dinkowski on adaptive behavior, and probably better than I've been able to do. So I would urge the court to go back and look at that dissent. Well, and Judge Price says that the procedure used by the state court the second time around didn't inspire confidence, but then I thought, well, is that enough for us to disregard it because AEDPA requires us to give all this deference forward and backward? Was it such insufficient process the second go-around, the 2012 go-around, that we can disregard it under AEDPA or find it unreasonable under AEDPA? Well, you know, and I've done the best I can to respond to that concern, I think. Judge Owen, going to your concern under Brady about having to resort to an Open Records Act to get Brady material, we've cited or quoted at length in our supplemental COA brief from the Supreme Court decision in Strickler v. Green, where it makes very clear that, as you were saying, trial counsel is entitled to rely for a variety of reasons on having been provided exculpatory evidence. State habeas counsel is as well. So there is a serious question about cause there that Judge Lake overlooked, I think. Finally, I'd like to spend my last minute or two urging the court to seriously look at the Batson claim. As you know, the trial court found that an African-American juror was excluded improperly under Batson, racially motivated exclusion. But then instead of doing one of the two things that Batson said, which is to seat the juror who was excluded, or to start all over, the court didn't either. It simply dismissed this small group of jurors that that African-American juror was questioned with and gave back the prosecutor's preemptory strike. So, in fact, the prosecutor got what he wanted. He got rid of the African-American juror, and he didn't even have to waste a preemptory strike. But what Supreme Court case says that the procedure that was done in Batson is the only way to remedy a Batson? Well, what the Supreme Court gave was two alternatives, you know, re-seat the juror or start over. This was not a start over. And the reason those are the two alternatives is starting over – well, seating the juror obviously gets rid of the taint because the juror's there. But if you don't start over, the process is tainted because you have – or if you don't seat the juror and you don't start over, the taint is still there because a client, any client, is entitled to a jury chosen from among the venire without racial exclusion. And if you don't start over entirely with a brand new venire and do it from day one, that taint is still there. It's there. And that's why the Supreme Court said those are the two alternatives. It said that very clearly in Batson. So it's not simply – and I probably didn't make this as effective an argument as I should have. It's not just that it rewarded the prosecutor and gave him what he wanted. It is that it left a taint in this jury that could only be undone in two ways, and it didn't happen here. The taint was still there. I really urge you to take a second look at that. Okay. Thank you very much, Mr. Cabrera. We appreciate your argument. Appreciate your service to the court. So hearing nothing further, the panel will stand adjourned.